MISSOURI & NORTH ARKANSAS RAILROAD COMPANY v.

COLLINS.

Opinion delivered February 3, 1913.

1. RAILROADS—NEGLIGENCE—SUFFICIENT EVIDENCE TO SUBMIT TO JURY.— When plaintiff is injured by the slipping of a wrench while attempting to adjust an oil cup on a locomotive, and there is proof that one side of the cup was rounded so that a wrench would slip, and that defendant's servant, whose duty it was to inspect for such defects and correct the same failed to discover the defect, there is sufficient evidence to make a question for the jury both as to the defect in the cup and the negligence of the defendant in failing to be aware of and correct the defect. (Page 360.)

2. MASTER AND SERVANT—ASSUMED RISK.—When a locomotive engineer is injured by the slipping of a wrench on a defective oil cup, and it appears that he had no knowledge of the defect until after the injury, and in the ordinary discharge of his duties, especially at night, when the accident occurred, the defect was not an obvious

one, the engineer will not be held to have assumed any risk in attempting to adjust the oil cup. (Page 360.)

3. DAMAGES—COMPENSATION FOR PAIN AND SUFFERING.—In an action for damages for personal injuries a verdict of $2,200 is not excessive, when it appears that plaintiff's medical bill was $100 and he lost $750 in wages, and there is proof of his having experienced great pain and suffering on account of his injuries. (Page 361.)

4. EVIDENCE—TESTIMONY AS TO POSSIBLE INJURY.—While the rule of evidence will not permit a physician to testify as to his opinions as to what may happen to plaintiff following an injury, a statement by a physician that the natural and probable result of the injury to plaintiff is Bright's disease does not violate that rule, especially when he also testifies that plaintiff is practically well, and that his kidneys are in good condition. (Page 361.)

Appeal from Carroll Circuit Court; *J. S. Maples,* Judge; affirmed.

*W. B. Smith, J. Merrick Moore, Troy Pace* and *H. M. Trieber,* for appellant.

1. There was no duty upon appellant to make an inspection for the purpose of seeing whether the nut attached to the top of the rod cup was perfectly square on all its corners, nor any negligence in sending out an engine having thereon a nut one corner of which might have been worn away. 1 Bailey on Master & Servant (2 ed.), § 251; 76 N. W. (Mich.), 497; 112 N. W. (Neb.), 318; 38 S. E. 876; 82 S. W. 319; 98 Fed. 192; 104 N. W. (Ia.), 577; 106 N. W. (Wis.), 106; 98 Tex. 225.

2. If such a rod cup or nut as is complained of was left upon appellant's engine, appellant could not reasonably have anticipated, as a result, appellee's injury, and there is no such relation of proximate cause and result as to render appellant liable. 86 Ark. 289-291; 91 Ark. 260.

3. Appellee assumed the risk. *Supra;* 57 Ark. 503.

4. It was error to permit the witness Dr. Tatman, in the light of his statement that plaintiff's kidneys were practically all right at the time he testified, and that there was no present indication of Bright's disease or calculous, to speculate upon the possibility of his having

one or the other of these diseases as a consequence in the future. Watson on Damages for Personal Injuries, § 607; 75 N. W. (Mich.) 88, 89; 70 Atl. 189; 12 Am. & Eng. Enc. of L. 449, 450.

This error, when considered in connection with the evidence that no unusual pain or suffering is shown, nor permanent injury nor probability of incapacity for any great length of time from work, unquestionably led to the excessive verdict returned by the jury. 74 Ark. 326; 100 Ark. 526.

*Wade H. James* and *Claude A. Fuller,* for appellee.

1. That there was negligence on the part of appellant is established by the testimony of its own witness, Davis. Whether it was a duty appellant owed to make an inspection or not can not now be raised by appellant for the testimony shows that it elected to make inspection of rod cups and engineers contracted with that in view. It was its duty to furnish an engine properly equipped. Employers' Liability Act, § 1. The jury's verdict settles the fact that appellant did not use ordinary care to furnish an engine properly equipped, and it is liable under the law. 78 S. W. (Ark.) 220; 97 Ark. 556; 57 Ark. 505; 67 Ark. 295-306; 1 White on Personal Injuries on Railroads, 207; 35 Ark. 616; 82 Ark. 82.

There was no inspection of the engine. An ineffectual inspection, where a careful inspection would have revealed the defect, will not relieve from liability. 65 S. W. 668; 66 S. W. 477; 97 N. Y. S. 801; 96 S. W. (Ark.) 183; 1 White, Pers. Inj. on Railroads, 270.

2. Appellant's negligence was the proximate cause of the injury. The proof shows that the cause of the injury, independent of intermediate causes, was the defective rod cup left upon the engine. 86 Ark. 289-291; 27 L. R. A. 538; 126 Ind. 391, 26 N. E. 64; 20 Mo. App. 222; 86 Tex. 708; 65 Tex. 274.

3. There was no assumption of risk. Appellee will not be presumed to have known that a defective rod cup was attached to his engine, neither was that fact obvious

to him or to a reasonably prudent person. 97 Ark. 556, 558; *Id.* 347.

4. The testimony of Dr. Tatman was not prejudicial. Appellant is benefited rather than injured by his answers. 55 Ark. 163; *Id.* 12; 31 Ark. 365; 28 Ark. 531; 66 Ark. 16-21.

The verdict is not excessive.

SMITH, J. Williams Collins, a locomotive engineer in the employ of appellant, brought suit for personal injuries. He alleged that his injury occurred as follows: That he was given charge of an engine and caboose at Eureka Springs, Arkansas, with instructions to proceed to Berryville, Arkansas, and make up a train to Seligman, Mo. That said engine was an overhauled engine, which had never been "broken in," as was customary after overhauling an engine before using it, as directed. That he started with his engine, but at King's River bridge, he discovered that the mainpin on the right side of the engine was running hot, which was caused by a rod being keyed up too tight; that the plaintiff on the return trip from Berryville discovered at Gaskin that it was necessary to loosen a rod cup with a wrench, on account of the mainpin running hot. That in attempting to loosen said rod cup, he attached the wrench to it as is customarily done, and while attempting to loosen said rod cup, the wrench slipped and he was thrown upon his back across a large stone. That the slipping of the wrench was caused by one of the corners of said cup being round and mashed so that the wrench did not hold and that his fall was caused by reason of it slipping and that as a result thereof, he was confined to his bed for two weeks; that his left kidney was torn loose from its natural position and badly lacerated; that he suffered much pain; and that he has since been unable to do any kind of work, or to be at ease physically; that he was permanently injured, and had suffered a decrease in his earning capacity; had lost, and would lose much time from his work; and had incurred large expense for medical treatment.

The answer admitted defendant's employment, but denied all the allegations of the complaint and alleged that if plaintiff was injured, the injury resulted from his own carelessness in the performance of his work, and pleads assumption of risk.

. Plaintiff testified that he had been a locomotive engineer for six years and was operating a train, carrying goods in an interstate shipment. That when he got to King's River bridge, it became necessary to stop his engine as the mainpin was running hot and to fill the cup with grease; that standing on the side of the engine on the cinder platform, he tried to unscrew the cup with a monkey wrench, but it was on too tight and he had to get the fireman to help him get the cup off with the coal pick; the fireman filled the cup with grease and they proceeded with the engine to Gaskins, where another stop had to be made to fix the hot pin. That standing again at the side of the engine, on the cinder platform, plaintiff tried at this point to unscrew the cup by pushing against the handle of the monkey wrench, but it was on too tight. Witness then changed the wrench over to the other hand so that he could put his foot against the driving wheel and pull on the wrench handle. As he pulled, the wrench slipped off the cup, and he sustained the injuries for which he sues.

One witness testified on behalf of plaintiff that plaintiff did not appear to walk as erect as he did before his injury and the nurse, who ministered to him during his confinement in bed, stated that he suffered pain and passed blood several times, and another witness testified that he had massaged appellee's back during a period of two months; that at first it was discolored, but that there was now no discoloration or other evidence of his injury, although he still complained of a dull pain in the back.

Appellee testified that the wrench was safe, if the cup had not been round on one side, and that he did not know of this defect until after his injury, which occurred in the night time. There were witnesses, who testified

as experts, that it was not safe to pull on a cup with a round side with a wrench, especially when the cup was greasy, as they usually were.

It appeared to be conceded that the object of "breaking in" an engine was to see that the bearings would not run hot and time be lost in consequence; and that the failure to "break in" an engine would not endanger the safety of anyone, and the proof on the part of the defendant was that the engine had been broken in before being put back into service.

The evidence on the part of the defendant was also to the effect that the cup could be removed with safety in the exercise of ordinary care. Appellant also alleges that the verdict was excessive; and that the court erred in permitting one Dr. Tatman, a witness for appellee, to testify as to certain possible results that might arise from such an injury as plaintiff claimed to have received. In the course of the examination of this witness, the following questions and answers appear:

Q. Go ahead and state then what the natural and probable consequences of injury to the kidneys would be.

A. One of the probable results of injury to the kidneys is calculous.

Q. What other, doctor?

A. I will state the possibility of Bright's disease.

Q. What is Bright's disease?

A. Chronic inflammation of kidneys, or it may be acute. In cases of this character, it may be more of a chronic type. There is practically two forms of Bright's disease.

Q. What in reference to cure of it, chronic Bright's disease?

A. I forget what the per cent is, but it will go up from 75 to 90 per cent.

Q. What do the medical authorities count it as?

A. Practically incurable disease.

Q. What is calculous?

A. Stone in kidney.

Q. Is that a serious disease?

A. Yes.

And upon the cross examination of this witness, the following questions were asked and answers given:

Q. You say his spine is going to be all right?

A. Yes.

Q. And that his kidneys are practically all right now?

A. Yes, as far as I can find them now.

Q. Then you would not say that you are expecting as a natural and probable consequence of that fall that he is going to have Bright's disease, would you?

A. Those are possible causes.

Q. That is within the range of possibility, but you are not expecting it now as a natural and probable cause, are you, doctor?

A. There is no indication of it now.

The above questions and answers, elicited on direct examination, were over the objections and exceptions of the defendant.

The court gave a number of instructions at the request of both appellant and appellee, which fairly stated the law applicable to the issues of the case, and no serious objection is urged to the correctness of these instructions, and they are therefore not set out.

But a reversal is asked for the following reasons:

First, there was no negligence on appellant's part.

Second, appellant was guilty of no negligence which was the proximate cause of appellee's injury.

Third, appellee assumed all risk of injury attendant upon the condition of the rod cup.

Fourth, that the court erred in the admission of the evidence of Dr. Tatman, as shown above.

A. Witness, Walter Davis, who was appellant's hostler, testified in its behalf, and on his cross-examination made the following statements:

Q. I will ask you to state whether or not it is a portion of your duty to fill rod cups with grease before the engine starts out on a run?

A. Yes.

Q.  I will ask you also if it is a part of your duty to see that these cups and cup tops, and such things, are in proper condition?

A.  Yes.

Q.  I will ask you to examine that cup (the one in question, made an exhibit to appellee's testimony), and tell the jury whether or not that rod cup in that condition was on the engine that day?

A.  It looks like if it was, I couldn't have gotten the grease plug filled.  If it was on there I never saw it.

Q.  Suppose that you had discovered such a cup as that on there, what would you have done?

A.  I would have took it out and put on another.

Q.  I believe that you said it was your duty to observe for such defects as that?

A.  Yes, sir; the contract that the engineers had was that I was to fill the grease cups, and according to their contract, the company was to fill them and I was the hostler and it was put to me to fill grease cups and replace the cups when they got in bad condition.  Sometimes they got cross-threaded inside and if I find them that way, I take them out and put another on..

This evidence makes a question for the jury, both as to the defect in the cup and the negligent failure of the master to be aware of that defect.  It appears that tests were made before the jury as to whether the wrench would slip off the cup, and this cup which was sent up as an exhibit, appears to be round as described by witnesses.

Under proper instructions, submitting that issue, the jury found that the defective condition of the cup was the proximate cause of the injury.

Upon the question of assumption of risk, it is sufficient to say that appellee testified that he had no knowledge of the defective rod cup until after his injuries and it is not contended that he had this knowledge until after his trip had begun, and the hostler, whose duty it was to make the inspection, testified that he did not have this knowledge at all; and an expert engineer, who testified on behalf of appellant, when asked the question: "In

the ordinary discharge of his duty, especially at night, when he came to put a wrench there, would it be so obvious that he would see that bad place there on the cup?" Answered: "I don't think so. I know I would not."

The ground, however, upon which appellant apparently chiefly relies for a reversal, is that the verdict is excessive and that it was made so by the erroneous action of the court in permitting witness Tatman to answer the questions set out above. We are cited to the rule announced in American and English Enc. Law, Vol. 12, pp. 449 and 450, where it is said: "A physician may give his opinion as to the permanence of certain injuries, but such opinion must not be speculative or conjectural, nor can such witness testify as to what is merely possible. Within the foregoing rule a physician is competent to give his opinion as to the natural and probable result of the disease and the probability or reasonable certainty of recovery, but it has been held improper for a physician to give his opinion as to what is likely to follow, or what sometimes results, and such an opinion was held incompetent where the witness declined to say that certain results would follow with reasonable certainty." But this rule was not violated here, the witness was asked certain questions, which might have led into the realm of speculation within the inhibition of the rule above, but the witness expressly stated that appellee's kidneys were now in good condition, and that there was no indication of future trouble. The verdict in the case was for only $2,200, and of this sum, it appears that $100 was for his medical bill, and that his loss of time at $125 per month, the wages appellee was earning at the time of his injury, would have amounted to $750, leaving the sum of $1,349 as compensation for the pain and suffering, which we can not say is excessive under the proof of this case.

Upon the whole case, we are of opinion that the verdict of the jury was warranted by the evidence and the judgment is accordingly affirmed.